UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------------X

| | |
|---|---|
| In re: | Chapter 11 |
| RICHMOND HOSPITALITY LLC, | Case No.: 22-40507-jmm |
| Debtors. | |

-----------------------------------------------------------X

| | |
|---|---|
| RICHMOND HOSPITALITY LLC, | |
| Plaintiffs, | Adv. Pro. No.: 23-01096-jmm |
| v. | |
| PAUL TOTH, individually and 100-110 SOUTH BRIDGE LLC, | |
| Defendant. | |

-----------------------------------------------------------X

**MEMORANDUM DECISION**

LAMONICA HERBST & MANISCALCO, LLP
Joseph S. Maniscalco, Esq.
Lon J. Seidman, Esq.
3305 Jerusalem Avenue, Suite 201
Wantagh, NY 11793
Email: jsm@lhmlawfirm.com
*Counsel for Plaintiff*
*Richmond Hospitality LLC*

RIMON P.C.
Anthony C. Acampora, Esq.
100 Jericho Quadrangle – Suite 300
Jericho, NY 11753
Email: anthony.acampora@rimonlaw.com
*Counsel for Defendants*
*Paul Toth and 100-110 South Bridge LLC*

**INTRODUCTION**

Richmond Hospitality LLC ("Plaintiff" or "Debtor") leased vacant land from 100-110 South Bridge LLC ("South Bridge") intending to build a hotel. Mid-construction, South Bridge commenced an action for possession alleging it properly terminated the lease due to Plaintiff's defaults. Whether South Bridge properly terminated the lease was the subject of litigation in state court and this Court. Eventually, Plaintiff and South Bridge resolved their disputes through a stipulation that was "so ordered" by this Court.

The stipulation required Plaintiff to pay South Bridge $475,000 to cure prepetition monetary defaults under the lease and to conduct an auction to assume and assign Plaintiff's interest in the lease. In consideration of the cure payment and the auction, South Bridge agreed to support, and not interfere with, Plaintiff's sale of the lease.

Tri-Rail Designers & Builders, Inc. ("Tri-Rail") won the auction for the lease with a $4 million bid and executed an asset purchase agreement. Subsequently, Paul Toth ("Toth"), South Bridge's principal, spoke to Charles Ventimiglia ("Ventimiglia"), Tri-Rail's principal. Toth intimated that if Tri-Rail did not build a boutique hotel or first-class hotel on the leased premises, Tri-Rail would be embroiled in litigation. Subsequently, Tri-Rail terminated the asset purchase agreement.

Plaintiff then commenced this adversary proceeding against South Bridge and Toth (together, the "Defendants"). Plaintiff asserts a breach of contract claim and a claim for contempt against South Bridge alleging that South Bridge breached its obligation under the so-ordered Stipulation to support the sale and not to interfere with the sale. Plaintiff asserts a claim for tortious interference with contract alleging Defendants' conduct was improper and caused

Tri-Rail to breach the asset purchase agreement. Lastly, Plaintiff seeks equitable subordination of South Bridge's proof of claim.

For the reasons set forth herein, the Court finds that South Bridge intentionally breached the stipulation, and Plaintiff is entitled to judgment on its claims for breach of contract and contempt. Additionally, Toth's comments to Ventimiglia were improper and caused Tri-Rail to terminate the asset purchase agreement. Therefore, Plaintiff is entitled to judgment against Defendants on Plaintiff's claim for tortious interference with contract. Lastly, South Bridge's improper conduct damaged the creditors of Plaintiff's bankruptcy estate because the proceeds from the sale of the lease were to be used to fund distributions to Plaintiff's creditors. Therefore, Plaintiff is entitled to judgment equitably subordinating South Bridge's claim.

## JURISDICTION

The Court has jurisdiction over this adversary proceeding under 28 U.S.C. § 1334, 28 U.S.C. § 157(b)(2), and the Standing Order of Reference entered by the United States District Court for the Eastern District of New York dated August 28, 1986, as amended by the Order dated December 5, 2012. The Court may hear and determine the claims asserted in this adversary proceeding because they are core proceedings pursuant to 28 U.S.C. § 157(b)(2)(A), (B), (C), (M), and (N). This decision constitutes the Court's findings of fact and conclusions of law to the extent required by Rule 7052 of the Federal Rules of Bankruptcy Procedure.

## PROCEDURAL BACKGROUND

On March 16, 2022 (the "Petition Date"), Plaintiff filed a voluntary Chapter 7 petition for relief. Stip. of Uncontested Facts, ¶ 11. On May 18, 2022, the Court converted the case to a Chapter 11 case. Stip. of Uncontested Facts, ¶ 12.

South Bridge filed a proof of claim, identified on the claims register of Plaintiff's case as Proof of Claim 1-2, asserting a secured claim of at least $314,550.50 but does not identify its collateral.

On November 9, 2023, Plaintiff filed a complaint commencing this adversary proceeding. Compl., Adv. Pro. ECF No. 1.[1] On December 19, 2023, Defendants moved to dismiss the complaint (the "Motion to Dismiss"). Mot. Dismiss., Adv. Pro. ECF Nos. 5, 6. On February 29, 2024, Plaintiff filed opposition. Mem. Law. Opp'n Mot. Dismiss, Adv. Pro. ECF No. 13. The Court heard oral argument on April 24, 2024. H'rg Tr., April 24, 2024, Adv. Pro. ECF No. 40. On May 7, 2024, the Court entered an order granting the Motion to Dismiss in part and granting Plaintiff leave to replead. Order, Adv. Pro. ECF No. 17.

On May 28, 2024, Plaintiff filed its amended complaint. Am. Compl., Adv. Pro. ECF No. 18. Defendants answered on June 7, 2024. Adv. Pro ECF No. 20.

On July 18, 2025, the Court referred the parties to mediation. *See* Mediation Order, Adv. Pro. ECF No. 31. The parties mediated until at least January 2026 but were unable to reach a settlement. Mediator's Report, Adv. Pro. ECF No. 42.

The Court held trial on January 28, 2026. H'rg Tr., January 28, 2026 ("Tr."), Adv. Pro. ECF No. 40. The Court heard testimony from Joseph Maniscalco, Esq., Robert Solomon, Esq., Toth, and Ventimiglia. Joseph Maniscalco, Esq. is a partner at the law firm that represents Plaintiff in this adversary proceeding and its bankruptcy case. Tr. 23:20-25; 24:1-12. Robert Solomon, Esq. represented South Bridge in Plaintiff's bankruptcy case and in connection with this adversary proceeding, until it appeared that he likely would be called as a fact witness. Tr. 78:5-10.

[1] Citations to "Adv. Pro. ECF No. []" are to documents filed in *Richmond Hospitality, LLC v. Paul Toth, individually and 100-110 South Bridge LLC*, Adv. Pro. No. 23-01096-jmm.

The parties completed post-trial briefing on March 13, 2026. Pl.'s Findings of Fact and Conclusions of Law, Adv. Pro. ECF No. 45 as corrected ECF No. 48; Def. Findings of Fact and Conclusions of Law, Adv. Pro. ECF No. No. 47.

## BACKGROUND

The Ground Lease and the Project

R.A. Properties, LLC ("RA Properties"), as lessor, and Plaintiff, as lessee, entered into a Ground Lease Agreement, dated as of December 18, 2014 (as amended, the "Lease") for the real property commonly known as 100-110 South Bridge Street, Staten Island, New York 10309 (the "Property"). Stip. of Uncontested Facts ¶ 1; Tr. 129:13-23. Plaintiff leased the Property intending to build a Best Western Vib hotel. Stip. of Uncontested Facts, ¶ 3. RA Properties and Plaintiff entered into an Amendment to the Lease, dated as of November 22, 2026 (the "Lease Amendment). Stip. of Uncontested Facts, ¶ 1; Joint Exs. 1, 2. RA Properties assigned its interest in the Lease to South Bridge. Stip. of Uncontested Facts, ¶ 2. The Lease is governed by New York state law. Lease Section 27-6.

The Lease defines "Project" as a "four (4) story hotel, containing not less than sixty (60) hotel rooms with a rooftop bar, together with related improvements." Lease at 1. "Hotel" is defined in the Lease Amendment as "an establishment providing, on a short-term basis, accommodations, meals and other services for travelers and tourists (transient guests)." Lease Amendment at 1.

Lease Section 2.09 (the "Permitted Use Clause") requires the Property be used for "the construction, equipping, operation, use and occupancy of the Project, and ancillary uses directly related to the operation, use and occupancy of the Project together with related improvements, all in accordance with the requirements of applicable Law." Lease at 4, 11.

Toth and his Properties

Toth is South Bridge's owner and principal. Tr. 129:22-25; 130:1-3. Toth also owns and manages several other Staten Island-based companies, including RA Properties. Stip. of Uncontested Facts, ¶ 6. RA Properties owns real property commonly known as 60 South Bridge Street, that is used as a catering hall named Ariana's. Tr. 130:11-21. Ariana's monthly rent under its lease with RA Properties is $14,520, subject to escalation. Tr. 131:5-12. Toth, directly or indirectly, owns three other properties on Staten Island. Tr. 131:20-132:5.

The Holdover Proceeding

On August 17, 2020, South Bridge served Plaintiff with a notice of default under the Lease. Stip of Uncontested Facts, ¶ 7. South Bridge claimed Plaintiff failed to pay rent, utilities, and real property taxes causing tax liens on the Property. *Id.* On December 4, 2020, South Bridge commenced a holdover proceeding (the "Holdover Proceeding") in Richmond County Civil Court. *Id.* at ¶ 8. On September 1, 2021, Plaintiff answered and counterclaimed. *Id.* at ¶ 9. Plaintiff commenced this bankruptcy case the day before the trial in the Holdover Proceeding. *Id.* at ¶ 10.

On March 30, 2022, South Bridge moved for relief from the automatic stay to continue the Holdover Proceeding. Stip. of Uncontested Facts, ¶ 11; Mot. Relief from Stay, Bankr. ECF No. 11.[2] On May 18, 2022, the Court denied the motion without prejudice. Stip. of Uncontested Facts, ¶ 12; Order, Bankr. ECF No. 55. On September 27, 2022, South Bridge again moved for relief from the automatic stay to continue the Holdover Proceeding. Stip. of

[2] Citations to "Bankr. ECF No. []" are to documents filed in *In re Richmond Hospitality LLC*, Chapter 11 Case No. 22-40507-jmm.

Uncontested Facts, ¶ 13; Mot. Relief from Stay, Bankr. ECF No. 103. As set forth below, the motion was settled by stipulation between Plaintiff and South Bridge.

Tri-Rail and The Asset Purchase Agreement

Tri-Rail builds high-end hotels and residences and develops properties in New York and Florida. Tr. 188:25-199:3. Tri-Rail worked on the Lincon Tunnel, JFK airport, and the Federal Circle and has built hotels from the ground up in New York and Florida. Tr. 189:3-4; 209:2-4. Tri-Rail has been in business since 1966. Tr. 189:4-5. Ventimiglia is the president of Tri-Rail. Tr. 189:8-9. Ventimiglia personally owns a hotel in Florida and has a management team that runs that hotel. Tr. 209:5-8. Ventimiglia's partners have experience operating hotels. Tr. 209:19-210:5, 15-17.

Plaintiff and Tri-Rail entered into an Asset Purchase and Sale Agreement, dated February 21, 2023 (the "APA") providing for Plaintiff to assign its interests in the Lease to Tri-Rail for Four Million Dollars ($4,000,000.00), subject to higher and better offers and Court approval. Stip. of Uncontested Facts, ¶ 15; Joint. Ex. 3. The APA required Tri-Rail to pay a $200,000 deposit to Plaintiff. APA, Section 2.3. Plaintiff moved for approval of: (a) the assumption and assignment of the Lease to Tri-Rail or the bidder submitting the highest and best bid at auction, (b) the APA, and (c) the terms and conditions of an auction sale for the Lease. Stip. of Uncontested Facts, ¶ 16; Mot. Sale of Property, Bankr. ECF No. 176.

Tri-Rail estimated it would cost approximately $5 million to complete construction of the building on the Property. Tr. 192:3-5. That cost would be in addition to the $4 million to be paid for the Lease under the APA. Tr. 192:12-14. Tri-Rail earns between $1 million and $2 million per month. Tr. 223:1-3.

The So-Ordered Stipulation

Plaintiff and South Bridge entered into an agreement resolving South Bridge's second lift stay motion (the "Stipulation"), that was "so ordered" by the Court on March 20, 2023. Stip. of Uncontested Facts, ¶ 17; Joint. Ex. 4. The parties stipulated that $475,000 was the amount necessary for Plaintiff to cure the pre-Petition Date defaults under the Lease under Bankruptcy Code section 365(b)(1) (the "Cure Amount"). Stipulation at ¶ 1. The Stipulation required Plaintiff to pay the Cure Amount in installments of (a) $50,000 on execution of the Stipulation, (b) $100,000 on April 10, 2023, (c) $100,000 on May 10, 2023, and (d) $225,000 on closing of the sale[3] of the Lease. Stipulation at ¶ 2; Stip. of Uncontested Facts, ¶ 18. Plaintiff paid $250,000 of the Cure Amount as required by the Stipulation. Stip. of Uncontested Facts, ¶19. The Stipulation also required Plaintiff to auction its interest in the Lease in accordance with certain deadlines and restrictions. Stipulation ¶ 3. The Stipulation required South Bridge "to support and not interfere in any way with the Debtor's Sale and Terms and Conditions of Sale Approval Motion." Stipulation ¶ 3; Stip. of Uncontested Facts, ¶ 20.

The Auction

On March 22, 2023, the Court signed an order approving the APA and the procedures for Plaintiff to auction the Lease and use the APA as a stalking horse bid. Stip. of Uncontested Facts, ¶ 21; Order, Bankr. ECF No. 211.

On May 10, 2023, the Court-approved auctioneer conducted the auction (the "Auction"). Stip. of Uncontested Facts, ¶ 22. There were no bidders at the Auction other

[3] The transaction required Plaintiff to assume and assign its interest as tenant under the Lease pursuant to Bankruptcy Code section 365(a) and (c). However, the parties refer to the transaction as a sale and the Court will refer to the transaction as a sale.

than Tri-Rail. Stip. of Uncontested Facts, ¶ 23. On June 30, 2023, Plaintiff moved to approve the Auction results and the sale of Plaintiff's interest in the Lease to Tri-Rail. Stip. of Uncontested Facts, ¶ 24; Mot., ECF No. 236. A hearing to confirm Plaintiff's sale of the Lease to Tri-Rail was scheduled for July 19, 2023**.**

<u>The Phone Call</u>

Sometime between May 10, 2023, and July 14, 2023, Ventimiglia called Toth. Tr. 137:25-138:2; Tr. 196:5-9. Toth described the phone call as a preliminary conversation that lasted three to five minutes. Tr. 172:19-173:5. Toth said the phone call was not adversarial or a "nasty conversation" and he expected Ventimiglia to call again. Tr. 172:22-173:2; 173:9-10.

Toth understood that Ventimiglia called him so that Toth could "get to know the guy he's going to be dealing with" and to show Toth that Tri-Rail had "the money and the ability" to complete the project. Tr. 138:8-14; Tr. 138:24-139:7; Tr. 174:20-23. Toth, however, was not concerned whether Tri-Rail had the money to complete the construction. Tr. 136:2-7. During the call, Ventimiglia asked Toth if they could meet in person, but Toth told Ventimiglia that it wasn't important that he meet Ventimiglia and Ventimiglia could give his information to Toth's attorney. Tr. 139:22-25, 174:22-175:2.

Toth recalled that Ventimiglia wanted to know how Toth felt about the project moving forward. Tr. 140:2-3; 175:2-3. Toth responded by saying he did not have a problem with the project if Tri-Rail followed the original plans but "if [Ventimiglia was] going to try to do a homeless shelter or something like that, him and I are going to have a problem." Tr. 140:6-10; 141:13-16; 142:9-143:6.

When Toth told Ventimiglia there would be no problem if Tri-Rail followed the original plans, Toth meant that Tri-Rail was to build a first-class hotel, like a Best Western Vib hotel. Tr. 145:22-146:5; 146:17-147:1-6. If Tri-Rail did not follow the original plans, the problem would be that Ventimiglia was going to be in court spending a lot of money on lawyers. Tr. 147:18-23; 175:5-10.

Toth admitted that neither Ventimiglia, nor anyone else from Tri-Rail, had mentioned building a homeless shelter. Tr. 136:16-18; 147:24-148:2. However, Toth said "the asylum seekers and homelessness was a big, big issue back then and, you know, I was not going to have it, so I told him that." Tr. 145:9-21; s*ee* Tr. 136:8-15 (the use of the Property as a homeless shelter was Toth's "worst nightmare"). Toth said he opposed using the Property for a shelter because his goal was "not to destroy the neighborhood and allow something to get built there that will bring everybody in and come and do okay." Tr. 148:7-11. Another reason Toth did not want the Property to be used as a homeless shelter was because Ariana's was nearby and paid rent. Tr. 147:11-15. Toth hoped the income from the project and Ariana's catering hall would enable him to retire; albeit Toth testified he did not think the Property was best suited for a hotel. Tr. 160:6-11; 137:7-24.

Toth testified his conversation helped Plaintiff because Ventimiglia:

> needed to know how much my feelings were about it going forward . . . . [W]hat would have happened had I not aired my opinion? And we went further down the road and he spent $4 million to find out that he's going to go back to court with me and the neighborhood. Not only me, it's all the politicians and lawyers and judges that live in that neighborhood that were up in arms about this.

Tr. 150:15-151:1. Notwithstanding his claim that he helped Plaintiff, Toth agreed his call with Ventimiglia was one reason Tri-Rail backed out of the sale and the call did not help the sale. Tr. 151:5-12.

Ventimiglia described the call as lasting five or six minutes. Tr. 214: 24-25.

Ventimiglia's impression was that Toth "didn't really seem interested in even talking to [Ventimiglia] or meeting with [Ventimiglia]. And he was kind of curt and . . . he did not want a migrant shelter." Tr. 215: 4-8. Ventimiglia did not believe that Toth expected Ventimiglia to call again. Tr. 220: 13-16.

Ventimiglia recounted that when he introduced the topic of what he wanted to do with the Property, Toth cut him off and said he wanted a boutique hotel. Tr. 196: 19-22; 200:11-19. Ventimiglia recalled that Toth "had mentioned that he owned several properties in the neighborhood and he didn't want like a migrant shelter or anything like that. It was pretty clear that he wanted a boutique hotel." Tr. 197:10-14; *see* Tr. 216:5-6 (Toth was firm "it's either boutique hotel or nothing.").

Despite the use clause in the Lease, Tri-Rail was contemplating using the Property for an assisted living facility or other type of housing. Tr. 196:22-24. After the call, Ventimiglia and his partners determined not to go forward because "we thought we would be up against it, and at the end of the day, we wouldn't be able to put who we wanted to put in our hotel or our assisted living or whatever it might be." Tr. 197:19-24.

Ventimiglia testified that before the phone call, Tri-Rail planned on closing on the APA and the phone call was a substantial reason for Tri-Rail backing out. Tr. 201:25-202:6.

<u>Tri-Rail Terminates the APA</u>

On July 14, 2023, Tri-Rail filed a letter ("<u>Tri-Rail Letter</u>") terminating the Asset Purchase Agreement, that stated in part that:

> Following extensive discussions and evaluations with the Landlord of the involved property, it has come to light that there are significant limitations on the use of the land. We were informed that any other use for the property cannot be pursued, and that the only permissible development is a boutique hotel.

> The purchase price included the acquisition of all filings, permits, and approvals for the Project, a real estate hotel development in Staten Island. However, the permits and approvals have expired. As such, Richmond Hospitality cannot deliver all of the assets included in our original bid. To use the property as South Bridge permits, we would require time and money to apply for the approvals again, and we are not guaranteed that the permitted use would be approved. For these reasons and others, Tri-Rail is terminating the Asset Purchase and Sale Agreement.

Stip. of Uncontested Facts, ¶ 26; Joint. Ex. 5.

Ventimiglia said the "extensive discussions and evaluations with the Landlord" meant Ventimiglia's one call with Toth. Tr. 199:11-20. Regarding the "significant limitations on the use of the land," Ventimiglia said that Toth "basically said to us he wants nothing but a boutique hotel there. So that limits us to one type of client." Tr. 200:3-10. Ventimiglia testified that the expired permits were less of an issue for Tri-Rail because they could reapply for permits, Tri-Rail often reinstates permits, and it was "fairly easy." Tr. 201:10-14; 221:16-20.

Tri-Rail's termination of the APA resulted in Tri-Rail forfeiting its $200,000 deposit. APA, Section 2.5. However, Tri-Rail was not obligated to pay the $3.8 million that would have been due at closing. *Id.*

<u>South Bridge Regains Possession of the Property</u>

On July 11, 2023, Plaintiff filed an amended sale motion that sought modification or clarification of the Permitted Use Clause (the "Amended Sale Motion"). Stip. of Undisputed Facts, ¶ 28; Mot., ECF No. 240. South Bridge opposed the Amended Sale Motion. Stip. of Uncontested Facts, ¶ 29; Opp., ECF No. 243. By order dated October 10, 2023, the Bankruptcy Court denied the Amended Sale Motion. Stip. of Uncontested Facts, ¶ 30; Order, ECF No. 281. By order dated October 15, 2023, the Court modified the automatic stay to permit South Bridge to obtain possession of the Property. Stip. of

Uncontested Facts, ¶ 31; Order, ECF No. 282. Plaintiff moved for reconsideration of the Court's orders denying the Amended Sale Motion and terminating the automatic stay, which motion was denied. Stip. of Uncontested Facts, ¶ 32; Order, ECF No. 285. South Bridge resumed the Holdover Proceeding and obtained possession of the Property. Stip. of Uncontested Facts, ¶ 32.

After obtaining possession of the Property, South bridge leased the Property to a new tenant. Tr. 183:8-12. The new tenant continued construction on the building. Tr. 183:8-10. Toth explained that the tenant reinstated the existing building permits that permitted the building to be used as a hotel; however, the building will not be used as a hotel. Tr. 183:18-21. Toth testified the building will be a medical facility that provides housing for veterans. Tr. 183:24-184:9.

## DISCUSSION

## FIRST CLAIM FOR RELIEF
**(Breach of Contract)**

Under New York law, the elements of a breach of contract claim are (1) the existence of a contract, (2) the plaintiff's performance pursuant to the contract, (3) the defendant's breach of its contractual obligations, and (4) damages resulting from the breach. *Diesel Props S.r.l. v. Greystone Bus. Credit II* LLC, 631 F.3d 42, 52 (2d Cir. 2011).

Plaintiff claims the Stipulation was a contract and Plaintiff performed under that contract by, among other things, paying the Cure Amount and auctioning the Lease. Plaintiff claims South Bridge breached paragraph 2(a) of the Stipulation, which required South Bridge to "support and not interfere in any way with the [Plaintiff's sale]." Specifically, Plaintiff contends that Toth's phone call with Ventimiglia did not support the sale, interfered with the sale, and was a substantial reason that Ti-Rail terminated the APA. Plaintiff claims South

Bridge's breach of contract damaged Plaintiff and caused Plaintiff to lose the remaining $3.8 million of the purchase price for the Lease.

Defendants Breached the Stipulation

The Stipulation required Defendants "to support and not interfere in any way" with Plaintiff's sale of its interest in the Lease. A written agreement that is complete, clear, and unambiguous on its face must be enforced according to the plain meaning of its terms. *Pierson Lakes Homeowners Ass'n, Inc. v. Pierson Project, L.L.C. (In re Pierson Lakes Homeowners Ass'n, Inc.)*, 636 B.R. 574, 581 (Bankr. S.D.N.Y. 2022). "A contract is unambiguous if the language used has a definite and precise meaning unattended by danger of misconception in the purport of the agreement itself and concerning which there is no reasonable basis for a difference of opinion." *Id.*

When a term used in a contract does not contain a defined term, "it is common practice for the courts of [New York] State to refer to the dictionary to determine the plain and ordinary meaning of words to a contract." *Fed. Ins. Co. v. Am. Home Assur. Co.*, 639 F.3d 557, 567 (2d. Cir. 2011); *see e.g. 10 Ellicott Square Ct. Corp. v. Mountain Valley Indem. Co.*, 634 F.3d 112, 120 (2d. Cir. 2011) (looking to Black's Law Dictionary for definition of "executed" contained in construction agreement); *Dish Network Corp. v. Ace Am. Ins. Co.*, 21 F.4th 207, 213-214 (2d Cir. 2021) (looking to Webster's Third New International Dictionary for definition of "broadcast" in insurance policy); *Tecspec LLC v. Donnolo*, 24 Civ. 8077 (JHR) 2025 WL 1604333, at *5 (S.D.N.Y. June 6, 2025) (looking to Merriam-Webster Dictionary for definition of "business" contained in non-compete agreement).

Support means "to promote the interests or cause of especially by action or aid." *Support*, MERRIAM-WEBSTER.COM, https://www.merriam-webster.com/dictionary/support (last visited Apr. 9, 2026). Interfere means "to interpose in a way that hinders or impedes." *Interfere*, MERRIAM-WEBSTER.COM, https://www.merriam-webster.com/dictionary/interfere (last visited Apr. 9, 2026). Based on the foregoing, the Stipulation required South Bridge to promote the sale by action or aid and prohibited South Bridge from hindering or impeding the sale.

South Bridge did not act to promote or aid Plaintiff's Lease sale. Toth accepted Ventimiglia's phone call and spoke to him briefly. That is the only evidence of South Bridge's acts to support Plaintiff's sale. To the contrary, Toth admits he rebuffed Ventimiglia's invitation to meet in person and instructed Ventimiglia to speak to Toth's attorney instead. Toth admits his statements to Ventimiglia during the call did not help the sale. Further, despite claims to the contrary, Toth's statements regarding the construction of a shelter were not intended to help the sale. Rather, Toth made those comments to share his and the community's opposition to a shelter.

South Bridge interfered with Plaintiff's sale. Toth admits he told Ventimiglia that Tri-Rail needed to build according to the original plan, meaning a first-class or boutique hotel, and Tri-Rail could not use the building as a homeless shelter. However, the Lease only required compliance with the Permitted Use Clause. Considering the Lease's definitions of Project and Hotel, the Permitted Use Clause would have required Tri-Rail to construct, equip, and operate, the use and occupancy of a four (4) story establishment providing, on a short-term basis, accommodations, meals and other services for travelers and tourists, containing not less than sixty (60) hotel rooms with a rooftop bar, together with related improvements. The Permitted

Use Clause did not require the tenant to build or operate a first class or boutique hotel. Further, the Permitted Use Clause did not prohibit asylum seekers or unhoused persons from booking rooms. Rather, the Lease only required the hotel be used for travelers and tourists. Moreover, Toth interfered with the sale by threatening litigation if Ventimiglia did not build according to the original plan.

Defendants argue that Toth's statements cannot constitute a breach of the Stipulation because Toth accurately stated his interpretation of the Lease. Def. Post-Trial Mem. at 4. But Toth's belief that the Lease required the construction of a boutique or first-class hotel was unreasonable based on the plain language of the Lease. Further, the Stipulation prohibited South Bridge from communicating opinions to Tri-Rail (that Tri-Rail did not ask for) that did not help the sale and interfered with the sale.

South Bridge argues the phone call could not be a breach due to its brevity. Def. Post-Trial Mem. at 4. The phone call was brief because Toth stated his feelings and was not receptive to additional conversation. South Bridge also argues that Toth's comments could not constitute a breach because Toth only provided information to Ventimiglia that Plaintiff provided to other potential bidders. Def. Post-Trial Mem. at 4-5. However, there is nothing in the record supporting the contention that Plaintiff or its professionals told potential bidders the Permitted Use Clause required construction of a first class or boutique hotel and prohibited use of hotel rooms for asylum seekers or the unhoused.

<u>South Bridge's Breach Caused Plaintiff to Suffer Damages</u>

In New York, "causation is an essential element of damages for breach of contract claims." *Trireme Energy Holdings, Inc. v. Innogy Renewables US LLC*, 706 F. Supp. 3d 409, 441 (2d Cir. 2023) (quoting *Nat'l. Mkt. Share, Inc. v. Sterling Nat'l. Bank*, 392 F.3d 520, 525

(2d Cir. 2004)). To prove causation, the defendant's breach must be both the direct and proximate cause of the plaintiff's damages. *Id.* Causation is established if the defendant's breach is a substantial factor in producing the plaintiff's damages and the damages are directly traceable to the breach. *See Coastal Power Int'l, Ltd. v. Transcon. Cap. Corp.*, 10 F. Supp. 2d 345, 366 (S.D.N.Y. 1998) (citations omitted), *aff'd*, 182 F.3d 163 (2d. Cir. 1999); *Wilder v. World of Boxing LLC*, 310 F. Supp. 3d 426, 445 (S.D.N.Y. 2018), *aff'd*, 777 F. App'x 531 (2d Cir. 2019) (summary order).

The substantial factor test is satisfied when "the defendant's actions would be thought of by people generally as having operated to an important extent in producing the harmful result." *Coastal Power*, 10 F. Supp. 2d at 366 (quoting Charles McCormick, *Handbook on the Law of Damages* 261, 1935). The defendant's breach need not be the sole or exclusive cause of the damages. *See Coastal Power*, 10 F. Supp. 2d at 366 ("The requirement of causation in fact is not a quest for the sole cause . . . it is enough that the defendant's . . . breach be a cause in fact of the harm") (emphasis and internal quotations omitted).

The causal chain between a defendant's breach and the plaintiff's injury can only be broken by an extraordinary act or an act "so attenuated from the defendant's conduct that the responsibility for the injury should not be reasonably attributed to them." *See NAF Holdings, LLC v. Li & Fung (Trading) Ltd.*, 10 Civ. 5762 (PAE), 2016 WL 3098842, at *6 (S.D.N.Y. June 1, 2016) (quoting *Johnson v. Bryco Arms*, 304 F. Supp. 2d 383, 395 (E.D.N.Y. 2004).

Damages stemming from breach of contract may be in the form of expectation, reliance or restitution damages, so long as "any claimed damages caused by [d]efendant's breach [are proved] to a reasonably degree of certainty." *Xpedior Creditor Tr. v. Credit Suisse First Boston (USA) Inc.*, 341 F. Supp. 2d 258, 271 (2d Cir. 2004). Under New York law, "[d]amages for

breach of contract should put the plaintiff in the same economic position he would have occupied had the breaching party performed the contract." *Process Am., Inc. v. Cynergy Holdings, LLC*, 839 F.3d 125, 143 (2d Cir. 2016) (quoting *Oscar Gruss & Son, Inc. v. Hollander*, 337 F.3d 186, 196 (2d Cir. 2003)); *see Ocwen Loan Serv., LLC v. The Rescap Liquidating Tr. (In re Residential Capital, LLC)*, 533 B.R. 379, 407 (Bankr. S.D.N.Y 2015) ("[T]he normal measure of damages [in New York] for breach of contract is expectation damages….").

Damages "may not be merely speculative, possible, or imaginary, but must be reasonably certain and directly traceable to the breach, not . . . the result of other intervening causes." *Kenford Co., Inc. v. Erie County*, 67 N.Y.2d 257, 261 (1986); *see Fruition, Inc. v. Rhoda Lee, Inc.*, 1 A.D.3d 124,125 (1st Dept. App. Div. 2003) ("The damages for which a party may recover for breach of contract are such as ordinarily and naturally flow from the non-performance").

Plaintiff has satisfied its burden of proving that South Bridge's breach of contract caused Tri-Rail to terminate the APA. Ventimiglia testified that his call with Toth was a substantial factor in terminating the APA and Tri-Rail terminated the APA after Ventimiglia's call with Toth. Ventimiglia also testified that the lapsed building permits were not a significant concern because Tri-Rail had rectified similar issues for other projects. In that same vein, Toth testified that the Property's current tenant successfully renewed the building permits and was using those permits to build a medical facility or for veteran's housing, notwithstanding the permits were issued for a hotel.

South Bridge argues that Tri-Rail's assertion that it terminated the APA due to Ventimiglia's conversation with Toth is disingenuous and unreasonable. Def. Post-Trial Mem.

at 3. However, Defendants' characterization of Tri-Rail's assertions is subjective and not supported by the record.

South Bridge argues Plaintiff's damages are speculative because Plaintiff did not prove that Tri-Rail could have provided South Bridge with adequate assurance of future performance. Def. Post-Trial Mem. at 14-16. South Bridge is correct that Plaintiff would have had to provide proof that Tri-Rail had the ability to perform under the Lease before the Court could approve Plaintiff's assumption and assignment of the Lease to Tri-Rail.

Bankruptcy Code section 365(b)(1)(C) provides "[i]f there has been a default in an . . . unexpired lease . . . the [debtor in possession] may not assume such . . . lease unless . . . the [debtor in possession] provides adequate assurance of future performance." 11 U.S.C. § 365. However,

> [t]here is no general definition of the term 'adequate assurance.' Its meaning is left to be developed based on the facts and circumstances of each case. The case law consistently counsels a flexible approach and a pragmatic assessment of the circumstances present and the test is not one of guaranty but simply whether it appears that [underlying obligations] will be paid.

*In re Broadway Realty I Co., LLC*, 677 B.R. 786, 795–96 (Bankr. S.D.N.Y. 2026) (internal quotations and citations omitted).

Here, Ventimiglia testified that Tri-Rail had significant experience in building and operating hotels and generated between $1 million and $2 million per month. South Bridge adduced no evidence suggesting that Tri-Rail lacked the experience or financial wherewithal to perform under the Lease or otherwise would not be able to provide adequate assurance of future performance. Toth admitted he was not concerned whether Tri-Rail had the money to complete the construction. Therefore, the prospect that Tri-Rail would be unable to provide adequate assurance of future performance is not an extraordinary act or an act so attenuated from South Bridge's breach as to break the causal link between South Bridge's breach of the Stipulation and Plaintiff's damages.

Plaintiff seeks $3.8 million in damages, representing the difference between the $4 million purchase price under the APA and the $200,000 deposit that Tri-Rail forfeited to Plaintiff. South Bridge does not dispute the damage calculation. The damages are not speculative and calculated to put Plaintiff in the position it would have been had South Bridge performed.

For the reasons set forth above, Plaintiff has satisfied its burden of proving that Plaintiff had a contract with South Bridge, South Bridge breached the contract, and Plaintiff's $3.8 million in damages was caused by South Bridge's breach.

**SECOND CLAIM FOR RELIEF**
**(Tortious Interference with Contract)**

Under New York law, the elements of tortious interference with contract are: "[1] the existence of a valid contract between the plaintiff and a third party, [2] defendant's knowledge of that contract, [3] defendant's intentional procurement of the third-party's breach of the contract without justification, [4] actual breach of the contract, and [5] damages resulting therefrom." *Rich v. Fox News Network, LLC*, 939 F.3d 112, 126-127 (2d Cir. 2019) (quoting *Lama Holding Co. v. Smith Barney Inc.*, 88 N.Y.2d 413, 424 (1996)); *Kaplan v. Reed Smith LLP*, 919 F.3d 154, 160 (2d Cir. 2019); *Kirch v. Liberty Media Corp.*, 449 F.3d 388, 401-402 (2d Cir. 2006).

Defendants do not contest that: there was a contract, namely, the APA between Plaintiff and Tri-Rail; they knew about the APA; Tri-Rail breached the APA; and, Plaintiff suffered damages. Defendants claim Plaintiff failed to prove the third element – that Defendants intentionally procured Tri-Rail's breach of the APA, without justification.

To satisfy the "intentional procurement of the third-party breach" element, a plaintiff must establish that: (1) the target of the defendant's conduct was the third party's contractual

arrangements with the plaintiff, and (2) the defendant's objective was to procure such breach. *See G.K.A. Beverage Corp v. Honickman*, 55 F.3d 762, 767-768 (2d Cir. 1995); *Better Holdco, Inc. v. Beeline Loans, Inc.*, 666 F. Supp. 3d 328, 399 (S.D.N.Y. 2023). "It is not enough that a defendant engaged in conduct with a third-party that happened to constitute a breach of the third party's contract with the plaintiff; instead, the evidence must show that the defendant's objective was to procure such a breach." *Roche Diagnostics GmbH v. Enzo Biochem*, *Inc*., 992 F. Supp. 2d 213, 221 (S.D.N.Y. 2013); *see Health-Chem Corp. v. Baker*, 915 F.2d 805, 809 (2d Cir. 1990) (Procurement of breach must occur intentionally, "not incidental to some other lawful purpose.").

Further, the plaintiff must show the defendant's act was without reasonable justification or improper. *Jews for Jesus, Inc. v. Jewish Cmty. Rels. Council of New York, Inc.*, 968 F.2d 286, 292 (2d Cir. 1992). To determine whether the interference was reasonably justified or improper, courts balance a variety of factors, including "the nature of the defendant's conduct, the defendant's motive, the interests of the plaintiff with which the defendant interferes, the interests the defendant seeks to advance, the social interests at stake, the proximity of the defendant's conduct to the interference, and the relations between the parties." *Id*. at 292 (internal quotations and citations omitted).

Whether conduct is improper may turn on whether the defendant's conduct interfered with an existing contract or a prospective contract. New York law recognizes the tort of interference with both prospective and existing contracts. *White Plains Coat & Apron Co. v. Cintas Corp.*, 8 N.Y.3d 422, 425 (2007). However, "greater protection is accorded an interest in an existing contract (as to which respect for individual contract rights outweighs the public

benefit to be derived from unfettered competition) than to the less substantive, more speculative interest in a prospective relationship." *Id*. at 426. For that reason,

> [w]here there is an existing, enforceable contract and a defendant's deliberate interference results in a breach of that contract, a plaintiff may recover damages for tortious interference with contractual relations even if the defendant was engaged in lawful behavior . . . . Where there has been no breach of an existing contract, but only interference with prospective contract rights, however, plaintiff must show more culpable conduct on the part of the defendant.

*NBT Bancorp Inc. v. Fleet/Norstar Fin. Grp., Inc*., 87 N.Y.2d 614, 621 (1996).

Litigation or the threat of litigation is improper conduct "(1) 'if the actor has no belief in the merit of the litigation' or (2) if the actor, having some belief in the merits of the suit, 'nevertheless institutes or [threatens] to institute the litigation in bad faith.'" *Kramer v. Lockwood Pension Servs., Inc.*, 653 F. Supp. 2d 354, 382 (S.D.N.Y. 2009) (quoting *Universal City Studios, Inc. v. Nintendo Co.*, 797 F.2d 70, 75 (2d Cir. 1986)); *cf.* *Kaplan v. Helenhart Novelty Corp*., 182 F.2d 311, 314 (2d Cir. 1950) (improper claims for patent infringement are not actionable if brought in good faith) (cited by Defendants).

"Economic Interest" is a defense to a claim of tortious interference with contract. *White Plains Coat & Apron Co.*, 8 N.Y.3d at 426. To prevail on an economic interest defense, the defendant must show:

> that it acted to protect its own legal or financial stake in the breaching party's business. The defense has been applied, for example, where defendants were significant stockholders in the breaching party's business; where defendant and the breaching party had a parent-subsidiary relationship; where defendant was the breaching party's creditor; and where the defendant had a managerial contract with the breaching party at the time defendant induced the breach of contract with plaintiff. A defendant who is simply plaintiff's competitor and knowingly solicits its contract customers is not economically justified in procuring the breach of contract.

*Id*.

Under New York law, the plaintiff may recover damages for tortious interference with contract for "(a) the pecuniary loss of the benefits of the contract or the prospective relation; (b) consequential losses for which the interference is a legal cause; and (c) emotional distress or actual harm to reputation, if they are reasonably to be expected to result from the interference." *Int'l Mins. & Res., S.A. v. Pappas*, 96 F.3d 586, 597 (2d Cir. 1996) (citing Restatement (Second) of Torts § 774A (1977)). "An injured party can recover punitive damages when the tortious act complained of involved a wanton or reckless disregard of the plaintiff's rights." *Int'l Mins. & Res., S.A. v. Bomar Resources, Inc.*, 5 F. App'x 5, 9 (2d Cir. 2001) (summary order) (quoting *Universal City Studios*, 797 F.2d at 77). Punitive damages are particularly appropriate if the "tortious conduct involve[ed] deliberate action systematically conducted for profit." *Universal City Studios*, 797 F.2d at 77 (quoting *Walker v. Sheldon*, 10 N.Y.2d 401, 406 (1961)). Generally, attorney's fees are not recoverable as actual damages in a tort action. *Goldberg v. Mallinckrodt, Inc.*, 792 F.2d 305, 309 (2d Cir. 1986) (citing *Coopers & Lybrand v. Levitt*, 52 A.D.2d 493, 496 (1st Dept. App. Div. 1976)).

Toth's call was with Tr-Rail's principal and concerned Tri-Rail's performance under the APA. Therefore, the Court finds that Defendants' conduct was targeted at Plaintiff's contractual arrangement with Tri-Rail.

The Court finds that Defendants' objective was to procure Tri-Rail's breach of the APA. Toth told Ventimiglia he wanted a first-class hotel or boutique hotel to be built on the Property, even though Toth did not believe the Property was best suited for a hotel, and the Lease did not require the tenant to build a first-class hotel or boutique hotel. After Tri-Rail terminated the APA, South Bridge leased the Property to an organization to build veteran's housing, not a boutique or first-class hotel. From that conduct, the Court infers that Defendants took the

position that Tri-Rail was required to build a first-class or boutique hotel to induce a breach and enable South Bridge to lease the Property to a tenant of its choosing.

Weighing all relevant facts and circumstances, Defendants' conduct was not reasonably justified and was improper. Although Defendants' conduct consisted of one, short, phone call, which weighs against a finding of impropriety; other factors weigh in favor of a finding that Defendants' conduct was improper.

First, Defendants' motives were improper. Toth's motives were to prevent Tri-Rail from building a homeless shelter and to obtain a first-class or boutique hotel on the Property. Toth believed a shelter was bad for the community and his business and Toth wanted a boutique hotel to benefit Ariana's catering business. Defendants' motives would not be improper except that South Bridge had a duty under the Stipulation to support Plaintiff's sale of the Lease and not to interfere with the sale. Instead of supporting the sale, Toth implemented his personal agenda.

Second, Plaintiff's interests in the APA were important. Plaintiff's rights under the APA were enforceable contract rights, not prospective contract rights. Furthermore, the APA was a substantial asset of Plaintiff's bankruptcy estate, and the sale proceeds could have provided a significant distribution to creditors.

Third, Defendants' interests in advancing the profitability of Toth's other businesses and preserving Toth's neighborhood are not more important than Plaintiff's interest in monetizing the Lease for the benefit of creditors.

Defendants argue that Toth's threat of litigation was not improper because Toth believed he was enforcing his legal rights. Def. Post-Trial Mem.at 6. However, Defendants' caselaw is inapposite or unpersuasive. In *Bechik Prods. v. Flexible Prods.*, 225 F.2d 603 (2d Cir. 1955),

cited by Defendants, defendant claimed it was improperly sued for unsubstantiated claims of patent infringement. *Id*. at 605. The Court held that unsubstantiated claims for patent infringement were not actionable if the claims were brought in good faith. *Id*. at 606 ("The owner of a patent has a right to threaten suits for infringement, provided he does so in good faith. . . . the reasoning underlying this rule: 'Patents would be of little value if the infringers of them could not be notified of the consequences of infringement.'"). Toth's threats of litigation were in bad faith because any belief that the Lease required the tenant to build a first-class or boutique hotel was unreasonable. *Supra* at 14-15. Moreover, Toth's threat of litigation was to induce Tri-Rail to breach the APA, as opposed to enforcing the Permitted Use Clause in the Lease. *Supra* at 22.

Defendants cite *Levy v. P&R Dental Strategies, Inc*., 302 A.D.2d 255 (1st Dept. App. Div. 2003) as support for their contention that there is no claim for interference "by refusing to waive the economic protection to which defendant *believed* it was contractually entitled." Def. Mem. at 6 (emphasis provided). Defendants' characterization of the case is misleading. In *Levy*, plaintiff sued his former employer for interfering with prospective employment. 302 A.D.2d at 255. The prospective employer had contracted with plaintiff's former employer and covenanted not to hire its former employees. *Id.* The Court held there was no tortious interference with plaintiff's prospect for employment because plaintiff's former employer was entitled to enforce its contract with the prospective employer. *Id*. The opinion is silent as to the former employer's beliefs and does not suggest the former employer had no right to enforce its contract with the prospective employer. Here, Defendants interfered with the APA, an enforceable contract as opposed to prospective employment as in *Levy*. Additionally, unlike the

former employer in *Levy*, Defendants had no legal right to interfere with the APA between Plaintiff and Tri-Rail.

Similarly, *Garrison v. Toshiba Bus. Sols. (USA). Inc*., 907 F. Supp. 2d 301, 308 (E.D.N.Y. 2012), cited by Defendants, is inapposite. Defendants cite *Garrison* as support for the proposition that the "expression of intention to enforce rights does not amount to wrongful tortious conduct." Def. Mem. at 7. In *Garrison*, plaintiff sued for tortious interference with a prospective business relationship, not tortious interference with contract. 907 F. Supp. 2d at 307. A claim for tortious interference with a prospective business relationship requires plaintiff to show something more than improper conduct; rather, the plaintiff must show the defendant used "wrongful means" such as "physical violence, fraud, misrepresentation, civil suits, criminal prosecutions and economic pressure." *Id.* at 307. *Thur v. IPCO Corp*., 173 A.D.2d 344, 345 (1st Dept. App. Div. 1991), cited by Defendants, is inapplicable for the same reason. In that case, plaintiff's former employer notified plaintiff's then current employer that its employment of plaintiff violated plaintiff's non-compete agreement. The employer then fired plaintiff. The court found that plaintiff's contract with its employer was terminable at will and, as such, plaintiff was required to show malice or the use of wrongful means. *Id.*

*MLI Indus., Inc. v. New York State Urban Dev. Corp.*, 205 A.D.2d 998, 1000-01 (3d Dept. App. Div. 1994), cited by Defendants is not persuasive. In *MLI Indus.*, the Urban Development Corp. threatened to terminate its loan forbearance agreement with a borrower, unless the borrower terminated its relationship with a vendor that improperly terminated a collective bargaining agreement. *Id*. at 999. The borrower terminated its relationship with the vendor, suffered a financial downturn, and then sued the Urban Development Corp. for tortious interference with contract. *Id*. The court held the Urban Development Corp.'s conduct was

justified by overriding public interests because it is a state agency dispensing public funds to the borrower and, "as such must be given leeway to influence business practices of the beneficiaries of those funds." *Id*. at 1001. Those public interests are not present in this case.

For the foregoing reasons, the Court finds that Defendants' conduct was directed at an existing contract, Defendants intended to procure Tri-Rails breach of the APA, Defendants' conduct was improper and not reasonably justified and caused Tri-Rail to breach the APA and the Debtor to suffer damages. Therefore, Plaintiff is entitled to compensatory damages of $3.8 million, plus interest and costs.

**THIRD CLAIM FOR RELIEF**
**(Equitable Subordination)**

"Section 510(c)(1) of the Bankruptcy Code authorizes this court to equitably subordinate claims. 11 U.S.C. § 510(c)(1). This remedy is available when (1) the claimholder engaged in inequitable conduct, (2) the misconduct caused injury to the creditors or conferred an unfair advantage on the claimholder, and (3) equitable subordination is consistent with bankruptcy law. *Kittay v. Atl. Bank of New York (In re Global Serv. Grp.), LLC*, 316 B.R. 451, 462 (Bankr. S.D.N.Y. 2004) (citing *In re Mobile Steel Co.*, 563 F.2d 692, 700 (5th Cir. 1977); *80 Nassau Assocs. v. Crossland Fed. Sav. Bank (In re 80 Nassau Assocs.),* 169 B.R. 832, 838 (Bankr.S.D.N.Y.1994); *In re Monahan Ford Corp. of Flushing*, 340 B.R. 1, 44 (Bankr. E.D.N.Y. 2006).

For insider creditor claims, courts have recognized three categories of misconduct that rise to the level of inequitable conduct for the purposes of 510(c)(1): "(i) fraud, illegality, or breach of fiduciary or other legally recognized duties; (ii) undercapitalization of the debtor; and (iii) control or use of the debtor as a mere instrumentality or alter ego to benefit another." *Off. Comm. Of Unsecured Creditors of Hydrogen, L.L.C. v. Blomen (In re Hydrogen, L.L.C.)*, 431

B.R. 337, 361 (Bankr. S.D.N.Y. 2010); *Mishkin v. Siclari (In re Adler, Coleman Clearing Corp.)*, 277 B.R. 520, 563-564 (Bankr. S.D.N.Y. 2002); *Off. Comm. Of Unsecured Creditors of Lois/USA v. Conseco Fin. Servs. Corp. (In re Lois/USA, Inc.)*, 264 B.R. 69, 131 (Bankr. S.D.N.Y 2001). Lawful conduct that shocks the conscience may be sufficient to warrant equitable subordination of a creditor's claim. *In re 80 Nassau Assocs.*, 169 B.R. at 837.

While traditionally the doctrine of equitable subordination was applied to insider claims only, courts have applied the doctrine to subordinate non-insider claims. *Adler*, 277 B.R. 520 at 564; *In re Global*, 316 B.R. at 462; *Gowan v. Wachovia Bank N.A. (In re Dreier LLP)*, 453 B.R. 499, 516 (Bankr. S.D.N.Y. 2011). However, if the creditor is not an insider or fiduciary of the debtor:

> unless the creditor has dominated or controlled the debtor to gain an unfair advantage, his claim will be subordinated, based upon inequitable conduct, only if the claimant has committed some breach of an existing, legally recognized duty arising under contract, tort or other area of law. In commercial cases, the proponent must demonstrate a substantial breach of contract and advantage-taking by the creditor.

*In re 80 Nassau Assocs.*, 169 B.R. at 840; s*ee also Tilton v. MBIA Inc. (In re Zohar III Group)*, 639 B.R. 73, 93 (Bankr. D. Del. 2022) (equitable subordination requires a showing that the creditor "either (i) created some unfair advantage for the claimant or (ii) harmed the debtor or its creditors."). Because equitable subordination is remedial and not penal, "a claim or claims should be subordinated only to the extent necessary to offset the harm which the bankrupt and its creditors suffered on account of the inequitable conduct." *Zohar III Group*, 639 B.R. at 93.

In this case, South Bridge breached an existing, legally recognized duty arising under the Stipulation by failing to support the sale and by interfering with the sale. As a result, Plaintiff was unable to sell the Lease to Tri-Rail and the bankruptcy estate lost the remaining $3.8 million due under the APA. Other creditors were damaged because the sale proceeds

could have been used to pay their claims. Moreover, Plaintiff paid $250,000 of the cure amount to South Bridge as required by the Stipulation– meaning South Bridge has already received an 80% distribution on account of its prepetition claims while other creditors have not received any distributions. Therefore, South Bridge's claims should be subordinated to all other general unsecured claims.[4]

**FOURTH CLAIM FOR RELIEF**
**(Contempt of Court Against Defendants)**

Bankruptcy courts have the inherent power to enforce compliance with their lawful orders through civil contempt. *Worms v. Rozhkov (In re Markus)*, 78 F.4th 554, 564 (2d Cir. 2023); *see also Solow v. Kalikow* (*In re Kalikow)*, 602 F.3d 82, 96 (2d Cir. 2010) ("The statutory contempt powers given to a bankruptcy court under § 105(a) complement the inherent powers of a federal court to enforce its own orders."). "If [] parties submit [a] stipulation to the court and it is so ordered and approved by the court, the noncompliance by one of the parties with such a stipulation may give rise to a contempt order because a so ordered stipulation has a double aspect both as a contract and as a court order." *Stein and Day Inc. v. Coordinated Sys. and Servs. Corp. (In re Stein and Day Inc.)*, 83 B.R. 221, 226 (S.D.N.Y. 1998) (internal quotations omitted).

To establish contempt in the Second Circuit, "a movant must establish that (1) the order the contemnor failed to comply with is clear and unambiguous, (2) the proof of noncompliance is clear and convincing, and (3) the contemnor has not diligently attempted to comply in a reasonable manner." *King v. Allied Vision, Ltd.*, 65 F.3d 1051, 1058 (2d Cir. 1995).

---

[4] South Bridge's asserts in its proof of claim that its claim is secured. The proof of claim does not identify South Bridge's collateral. To the extent, if any, the claim is secured, South Bridge's lien securing the subordinated claim shall be transferred to Plaintiff's bankruptcy estate pursuant to Bankruptcy Code section 510(c)(2).

"Sanctions for civil contempt may be imposed . . . to compensate for any harm that previously resulted from the noncompliance." *Merch. Acquisitions, Inc. v. Difficile Realty Corp. (In re Sun Prop. Consultants, Inc.)*, Case No. 16-72267-las, Adv. Pro. No. 20-08057-las, 2021 WL 2258271, at *4 (Bankr. E.D.N.Y. June 2, 2021) (internal citations and quotations omitted). Compensatory sanctions should be carefully crafted to reimburse an injured party for actual damages and should not be punitive. *Id.* "The court may, however, serve either goal—the coercive or the compensatory—by awarding attorneys' fees and costs to a contempt victim." *Id.* at *5 (quoting *Al Hirschfeld Found. V. Margo Feiden Galleries Ltd.*, 438 F. Supp. 3d 203, 208 (S.D.N.Y 2020)). "The traditional award of fees and costs on a contempt motion is targeted at the expense engendered in seeking relief for the contempt as such." *Fendi Adele S.R.L. v. Burlington Coat Factory Warehouse Corp.*, 642 F. Supp. 2d 276, 299 (S.D.N.Y. 2009).

The Stipulation required South Bridge to "support and not interfere in any way with the Debtor's Sale and Terms and Conditions of Sale Approval Motion." The Stipulation is unambiguous and requires South Bridge to promote the sale and prohibited South Bridge from hindering or impeding the sale. As set forth above, South Bridge did not promote Plaintiff's efforts to sell the Lease and interfered with the sale. *Supra* at 14-15.

South Bridge did not attempt to comply in a reasonable manner. South Bridge did not provide evidence from which the Court may infer that South Bridge attempted to comply or attempted to get the sale back on track after Tri-Rail terminated the APA. Accordingly, South Bridge is in contempt of the Stipulation and Plaintiff is entitled to damages of $3.8 million, plus interest, costs and reasonable attorneys' fees in an amount to be determined by the Court, to compensate Plaintiff for South Bridge's contempt.

**<u>CONCLUSION</u>**

For the reasons set forth above, Plaintiff is entitled to judgment:

(i) on the First Claim for Relief for breach of contract, against South Bridge for $3.8 million, plus interest and costs;

(ii) on the Second Claim for Relief for tortious interference with contract, against Defendants, jointly and severally, for damages in the amount of $3.8 million, plus interest and costs;

(iii) on the Third Claim for Relief for equitable subordination, equitably subordinating South Bridge's Proof of Claim to the claims of other unsecured creditors; and

(iv) on the Fourth Claim for Relief for contempt of Court, against South Bridge for $3.8 million, plus interest, costs and an award of Plaintiff's reasonable attorneys' fees in an amount to be determined by the Court.

Within fourteen days of entry of this Memorandum, and after consultation with Defendants, Plaintiff shall submit a proposed order scheduling a hearing for the Court to determine Plaintiff's reasonable attorneys' fees, that includes a proposed briefing schedule.

**Dated: August 17, 2026**
**Brooklyn, New York**

Jil Mazer-Marino
Chief United States Bankruptcy Judge